IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DELVIN DEMON MOORE | § | |
| | § | |
| v. | § | C.A. NO. C-11-117 |
| | § | |
| UNITED STATES OF AMERICA, ET AL. | § | |

## MEMORANDUM AND RECOMMENDATION TO DISMISS ACTION

This is a civil rights action filed by a federal inmate currently incarcerated at the Federal Correctional Institution in Herlong, California pursuant to 42 U.S.C. § 1983 and <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).[1] For the reasons set forth below, it is respectfully recommended that Plaintiff's claims be dismissed for failure to state a claim and as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b)(1).

### I. JURISDICTION

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.

### II. FACTUAL BACKGROUND

The following account is based on the allegations Plaintiff set forth in his complaint, (D.E. 1), and on the judicial records pertaining to the prosecution and trial which form the basis for most of his claims.

---

[1] Plaintiff styles his action as filed pursuant only to 42 U.S.C. § 1983, (D.E. 1, at 1), but three of the four named Defendants are federal actors, so <u>Bivens</u> is the appropriate vehicle for any claims against those individuals. See <u>Richardson v. Armato</u>, 67 F. App'x 242, 2003 WL 21108553, at *1 n** (5th Cir. Apr. 22, 2003) (per curiam) (unpublished) ("Although the defendants were not acting under color of state law as required by 42 U.S.C. § 1983 ..., Richardson's claims against them might be liberally construed as arising under <u>Bivens</u>....") (citation omitted). The fourth named Defendant is identified only as a "Hispanic law enforcement agent," (D.E. 1, at 1), and it is not clear from the complaint whether he was a state or federal officer or, if the former, whether he was working as a federal actor at the time of the events complained of. Regardless, the distinction is not relevant to the disposition of this action and it is assumed that Plaintiff is filing pursuant to whichever authority supports the respective claims. See <u>Barker v. Norman</u>, 651 F.2d 1107, 1111-12 (5th Cir. Unit A July 1981) (dealing with claim premised on <u>Bivens</u> with respect to one defendant and § 1983 with respect to another).

A.    **The Investigation.**

1.    **The October 5, 2004 incident.**

On or about October 5, 2004, Plaintiff and his fiancee Dashandra Williams were passengers in a car being driven by Walter Wolf from Texas to Louisiana. Id. at 2. When they arrived at the Sarita checkpoint in Kenedy County, Texas, United States Customs and Border Patrol agents instructed Mr. Wolf to stop the car at the "second primary area" in order for the vehicle to be searched. Id. The agents proceeded to search the car for the next twenty to thirty minutes. Id. Plaintiff asked a female agent why they had been stopped, and she replied that she had smelled marijuana. Id. at 2-3. She added that if any of the car's passengers admitted to smoking marijuana, the agents would allow them to go on their way. Id. at 3. Plaintiff responded that "she was lying," and that none of them had smoked marijuana. Id. This female agent then asked whether anyone in the party was Muslim. Id. Plaintiff "felt insulted and told her she stopped us because we were black." Id. After the agents finished searching the vehicle, they informed the group that nothing illegal had been found and so they were free to leave. Id.

As the three were returning to the car to depart, a pickup truck arrived. Id. The female agent asked Plaintiff and his companions, as well as Tamiko Patton, the driver and sole occupant of the truck, whether they were traveling together and all four replied in the negative. Id. Mr. Wolf then asked a male Border Patrol agent involved in the search whether he had removed his cell phone from the vehicle. Id. The agent denied taking the phone and the three left the checkpoint. Id.

When Plaintiff's party had advanced approximately fifteen miles, a law enforcement officer ("Defendant John Doe") pulled them over. Id. Defendant Doe approached the vehicle and explained that he was detaining them at the direction of Border Patrol agents. Id. at 4. Shortly thereafter, these

2

agents from the Sarita checkpoint arrived at the scene, and the three were again instructed to exit the vehicle. Id. When the same female agent took Plaintiff's cell phone, he informed her that it was locked with a pass-code and that he did not intend to tell it to her "because [he] had personal nude content in it." Id. at 4. She then made a call with the cell phone and asked the person on the other end to save the originating number. Id. Agents again searched the car and again found no evidence of criminal conduct. Id. Nevertheless, the female agent seized Plaintiff's phone. Id. Defendant Doe told Plaintiff that he was going to jail pursuant to "a blue warrant."[2] Id. at 5. When asked what that was, the female agent said, "that should be the least of your worries[,] we gonna get you for conspiracy later." Id. Under further questioning, Defendant Doe added that Plaintiff would shortly discover what a blue warrant was, explaining that "[w]e do things diffrently [sic] in Texas and we gonna get you." Id. Plaintiff responded, "as long as you tell the truth," and was told that "sometimes the truth aint [sic] what we want to hear in Texas." Id. He was then arrested and brought to Kingsville County Jail. Id.

Shortly thereafter, Plaintiff was brought to state court, where a prosecutor sought to charge him with possession of marijuana. Id. The state judge asked Ms. Patton who was in the truck with her and she replied that no one had been. Id. When he inquired whether she knew Plaintiff, she answered that she did not. Id. Testifying under oath, Plaintiff confirmed Ms. Patton's account. Id. at 6. The judge then asked the prosecutor "how and why would he charge me with [possession] of marijuana," also questioning him as to whether they had Plaintiff's fingerprints or a witness who saw him place the marijuana in Ms. Patton's truck. Id. The prosecutor answered that he had none of

---

[2] A "blue warrant" is a warrant issued when a released prisoner violates a condition of his parole or release. See Lowrey v. Collin Cnty. Sheriff's Dep't, No. 93-5081, 1994 WL 35601, at *1 n.1 (5th Cir. Jan. 26, 1994) (per curiam) (unpublished).

these things, but did know of Plaintiff's past criminal history, which included two drug arrests.  Id.
The judge remarked that "that's no reason to charge or arrest him."  Id.  He then stated to Plaintiff
that they did not "have any reason to hold you except for a blue warrant ... from Louisiana" and that
he would depart as soon as Louisiana authorities arrived.  Id.

### 2.    The January 12, 2005 incident.

On January 12, 2005, Plaintiff was a passenger in a rental car driven by Terry Wilson.  Id. at
7.  In Kingsville, Texas, the car was pulled over by a South Texas Specialized Crimes and Narcotics
Task Force agent ("SCNTF") and a police officer.  Id.  The SCNTF agent patted both men down and
asked whether they had any weapons or other illegal items on their bodies.  Id.  They told him that
they did not, but the agent then searched Mr. Wilson's pocket and removed "two or three counterfeit
bills."  Id.  The agent asked the individuals whether he could search the car, but they both declined
to offer their consent.  Id.  He asked Plaintiff whether he had anything in the car, to which he replied
that he had "some [CD's], a walkman, other electronic recording devices and" roughly $176,000.
Id.  The agent observed that he thought this money was likely counterfeit.  Id. at 8.  The SCNTF
agent retrieved a police dog and searched the vehicle.  Id.  When he saw the money, he "drew his gun
and screamed ... 'get down, don't [sic] act like your [sic] surprised, nigger[,] you know what the fuck
is going on.'"  Id.  The agent handcuffed Plaintiff and placed him under arrest without reading him
his rights as required by Miranda v. Arizona, 384 U.S. 436 (1966).  Id.  Plaintiff was placed in the
SCNTF agent's vehicle, advised that he was being arrested for money laundering,  and returned to
the Kingsville County Jail.  Id. at 8-9.

There, Plaintiff was interrogated by Officer Rowdy Booth, who notified him that he had two
hours to present proof that the money was rightfully his.  Id.  Plaintiff explained that the money  came

from investments made to his record label, Shop Shutter Records.  Id.  Allowed to use his cell phone, Plaintiff called his secretary, who confirmed to Officer Booth the existence of the record company. Id.  Officer Booth also spoke to Plaintiff's wife who related to him her husband's occupation.  Id. Shortly thereafter, the requested receipts documenting Plaintiff's rightful ownership of the cash arrived.  Id.  Officer Booth began to express irritation, telling Plaintiff that he "was not getting the money back."  Id.  Plaintiff notified him that he would be suing for it after he posted bond.  Id. Officer Booth observed that "he had someone he knew that could make sure [Plaintiff would not] get the money back."  Id. at 10.

Sometime thereafter, Plaintiff filed a civil suit in state court to reclaim the currency.  Id.  At his scheduled court date, he was informed that the money had been seized by the Border Patrol months earlier.  Id.  He proceeded to file a civil suit against the United States for the return of the currency.  Id.[3]

**3.     The April 27, 2005 incident.**

On April 27, 2005, Plaintiff was a passenger in a car driven by Monica Coleman as the two traveled to Zachary, Louisiana.  (D.E. 1, at 10-11).  In Jennings, Louisiana, a police officer pulled alongside the car, motioned her to the side of the road, and instructed her to exit the vehicle.  Id. Plaintiff opened the door to get out, but the officer directed him to remain in the car for a few moments while he asked more questions of Ms. Coleman.  Id. at 11-12.  The officer returned fifteen minutes later and ordered him to remain in the vehicle while he awaited backup.  Id. at 12. As he waited, Plaintiff observed that the officer was speaking to Ms. Coleman in a "very loud and intimidating" manner while providing her a form for her to offer her consent to search the vehicle.

---

[3] Plaintiff alleges that these two suits, as well as others, were intercepted by correctional staff and suppressed.  (D.E. 1-2, at 12-13).

Id. Ms. Coleman, who Plaintiff believes was illiterate, signed the form "while shaking," after which the officer directed Plaintiff to exit the vehicle. Id. at 13. He was asked to sign the consent form, but declined. Id. at 13. Other agents then found a "controlled dangerous substance" in the walls of the car after searching it with crowbars. Id. The vehicle was towed to a police facility, where it was dismantled, though nothing further was found and no inventory report was completed. Id. at 14.

### 4.     The June 14, 2005 incident.

On June 14, 2005, Plaintiff was approached at his parents' home in Louisiana by Defendant Aaron Rodgers, a United States Immigration and Customs agent, as well as several other agents, including the SCNTF officer who arrested him on January 12, 2005. Id. Defendant Rodgers asked Plaintiff if he was willing to discuss the money seized from him at that time, and whether he would allow him to call his investors in order to complete his money laundering investigation into the seized cash. Id. Plaintiff answered affirmatively, and called his investors to request that they bring him the transaction receipts. Id. at 14-15. The investors and other witnesses began appearing at the house at Plaintiff's behest with their receipts. Id. at 15. The SCNTF agent commented to Defendant Rodgers that he doubted these individuals' honesty. Id. At this point, Plaintiff became angry because the SCNTF agent had earlier treated him disrespectfully, and "told him in a loud and aggressive voice[:] 'no one has to lie to you, your [sic] the Agent who called me a nigger and an asshole on [the] side of the interstate. You need to find another job if you don't [sic] like black people or the African American Race…. If you were not an Agent or Police Officer of the Law I would kick your ass." Id.

Defendant Rodgers confronted Plaintiff, telling him that he could not "wait to get YOU PEOPLE BACK IN TEXAS." Id. at 16 (emphasis in original). One of Plaintiff's investors later told him that Defendant Rodgers sought to coerce him into claiming that the receipts were fake and that

he was "a drug dealer and a con-man." Id.  Concerned by this, Plaintiff brought all of his receipts to his attorney and purchased recording devices for himself and various witnesses and investors. Id. at 17.  He later discovered that Defendant Rodgers and other officers told several investors, witnesses, and business associates that he was a drug dealer and had been "arrested in Texas with kilo's [sic] of marijuana and cocaine at the Sarita U.S. checkpoint with Tamiko Patton." Id. Defendant Rodgers counseled these people that Plaintiff "was going down one way or the other and [that] they were going to lose everything they had if they came to court on [his] behalf." Id.

**B.      Plaintiff's Federal Prosecution Resulted In A Guilty Plea and Conviction.**

On or about June 17, 2005, Defendant Rodgers informed Plaintiff that he should get his investors and witnesses to testify before a federal grand jury in Corpus Christi, Texas on June 28, 2005. Id. at 17-18.  He advised him that each individual would then receive a check for their share of the money that had been seized. Id. at 18.  After participating in the grand jury proceedings, the individuals who took part recounted that "they were being degraded and discriminated against by ... [Defendant] [Assistant] United States ... Attorney Patricia Hubert Booth," as well as by some of the jurors. Id.  According to the investors, these abuses included attempts by Defendant Booth to attack their credibility when they vouched for Plaintiff's innocence through her body language, and various inappropriate remarks. Id. at 18-20.  The grand jury proceedings were also flawed because the practice in Corpus Christi was to call the same jurors repeatedly. (D.E. 1-2, at 21).

On or about July 1, 2005, Defendant Rodgers called Plaintiff's parole officer and falsely told him that he had been arrested for possession of marijuana at the Sarita checkpoint. (D.E. 1, at 20). He cautioned the parole officer that Plaintiff would be indicted in Corpus Christi for conspiracy and suggested that a warrant be issued. Id.  After the warrant's issuance, Plaintiff was arrested in Texas and promptly extradited to Louisiana, where he was confined at the Elayn Hunt Correctional Center

in St. Gabriel.  Id. at 20-21.

On August 2, 2005, a criminal complaint was filed in this Court, charging Plaintiff with possessing 76.8 kilograms of marijuana with intent to distribute on or about October 5, 2004 in Kleberg County, Texas.  United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 1).[4]  On or about August 17, 2005, Plaintiff was informed by an officer at the Correctional Center that federal marshals from Corpus Christi had sent an arrest warrant for a possession of marijuana charge relating to the incident with Ms. Patton.  (D.E. 1, at 21).  The officer asked him to sign the paperwork to facilitate his extradition back to Texas.  Id.  Plaintiff refused to do so, requesting that he be allowed to speak to his attorney in Louisiana first.  Id.  The officer responded that there was no time for that, as the marshals were already on their way.  Id.

Plaintiff was then transferred into the marshals' custody and brought to a "federal holding jail" in West Baton Rouge, where his request to see a judge was denied.  Id. at 21-22.  He was transported to Karnes City, Texas.  Id. at 22.  On August 25, 2005, Plaintiff was brought to this Court for an initial appearance.  Id.;  United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 9).  When Jon Brooks, Plaintiff's counsel, encouraged him to waive his preliminary examination and detention hearings, he told him he wanted to have them, but Mr. Brooks waived the detention hearing anyway.  (D.E. 1, at 23).  As a result, Plaintiff confronted Mr. Brooks and expressed to him his belief that he was untrustworthy and was working against his interest in concert with the government.  Id. at 24.

On September 6, 2005, Plaintiff's preliminary examination was held.  Id.; United States v. Moore, CR-05-542 (S.D. Tex. 2005).  Mr. Wolf and Ms. Adams appeared to testify on his behalf, but

---

[4] All references to the docket in Plaintiff's criminal case will recite the full case name and number. Citations to the docket in this civil rights action will refer only to the docket and page number.

Mr. Wolf was falsely told by a marshal that no hearing was scheduled.  (D.E. 1, at 24-25).  An employee of the clerk's office then confirmed that Plaintiff's hearing was set for 1:00 p.m., but the marshal told him he could not wait in the courthouse.  Id. at 25. After Mr. Wolf conveyed this information to Ms. Adams, the two went elsewhere to wait.[5]  Id.  When the hearing began, a marshal was sent to look for the two witnesses, but they could not be found in or around the courthouse premises.  Id. at 26.  Plaintiff insisted that the hearing be postponed until the witnesses were located, but Mr. Brooks commented that the judge would not wait "and the truth does not matter in Corpus Christi."  Id.

After the hearing began in the absence of the witnesses, Defendant Rodgers took the stand and falsely testified about Plaintiff's involvement in the alleged marijuana conspiracy.  Id. at 27-29.  Mr. Brooks was asked whether there were any witnesses to testify on his behalf and untruthfully told the court that there were not, though he asserted to Plaintiff that he submitted to the court exculpatory affidavits from Ms. Patton, Ms. Coleman, Mr. Wolf, and Ms. Adams.  Id. at 31.  Probable cause was found.  Id. at 30; United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 70, at 31).  Plaintiff informed Mr. Brooks that "his services were no longer needed."  (D.E. 1, at 31).

On September 14, 2005, Plaintiff was indicted for conspiracy to commit a drug offense between October 26, 1999 and April 28, 2005.  United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 21).  Between the preliminary hearing and September 27, 2005, Plaintiff's new attorney, David Bourland, advised him to draft a list of people he ought to interview to prepare his defense.  (D.E. 1, at 31).  Although he placed the list in a sealed envelope indicating that it was for his attorney only, a marshal at the federal courthouse tore it open and removed the sheet.  Id. at 32.  During this

---

[5] Plaintiff does not explicitly say so, but he appears to imply that the hearing was in fact held earlier in the day and that the witnesses were therefore wrongly instructed on the schedule.  (D.E. 1, at 27).

same time period, Defendant Rodgers threatened and harassed Plaintiff's witnesses, telling some that he would arrest their family members. Id.; (D.E. 1-2, at 17). Furthermore, Plaintiff claims that his phone privileges were restricted and he was not allowed to call his attorney "on a secured and private phone line." Id. He was also denied food for twenty days and forced "to choose between recreation and the law library," resulting in the loss of twenty-eight pounds. (D.E. 1, at 33).

On October 12, 2005, Plaintiff filed a motion to suppress evidence seized in violation of the Fourth Amendment and to quash a count of the indictment, United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 46). He claims that consequently he was placed in segregation in retaliation. (D.E. 1, at 33). On December 20, 2005, Defendant Judge Janis Graham Jack ruled that any evidence seized during, or as a result of, the search of Plaintiff's cell phone would be suppressed, and that a paragraph from his indictment would be stricken, though Plaintiff alleges that the latter was never done. Id.; United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 96, at 16). According to Plaintiff, she then wrongly concluded that there had been valid consent to the April 27, 2005 search of the vehicle, ignoring the evidence of police intimidation and the evidence that Plaintiff never consented. (D.E. 1, at 36).

On January 4, 2006, Defendant Booth made several false statements in court, including that Plaintiff had been dealing drugs from the Karnes County Correctional Center. Id. at 37. On January 30, 2006, she misrepresented to Defendant Judge Jack that a government witness had previously retained Mr. Bourland's legal services. Id. at 38. As a result, Mr. Bourland "was conflicted out on the day of trial or eve of trial," without a full hearing to inquire into the issue. Id. at 39. Defendant Judge Jack informed Plaintiff that he would have to represent himself if he had no attorney when trial began. Id. at 40. Defendant Booth then announced, "'[n]ow I've got you.'" (D.E. 1-1, at 1). On January 30, 2006, she falsely told the Court that Plaintiff had committed violent acts during the

course of the alleged conspiracy.  Id. at 6.

On or about February 2, 2006, Plaintiff was transferred to Nueces County Jail, placed in segregation, prevented from using the phone to find counsel, and denied sufficient food and water, as well as medical treatment, recreation, and necessary heating.  Id. at 1.  On or about February 14, 2006, he appeared in court for an emergency hearing concerning telephone communications, where the Court also appointed John Gilmore as his new attorney.  Id.  Plaintiff informed Mr. Gilmore that he did not care to work with him as he believed him to be in collusion with corrupt local politicians. Id. at 2.  Mr. Gilmore represented that Plaintiff would not be able to attend the hearing unless he accepted the appointment and he acceded.  Id.  Defendant Rodgers proceeded to testify untruthfully that Plaintiff was threatening government witnesses while in prison.  Id. at 3.

On or about February 28, 2006, Plaintiff was transported to the federal courthouse in Corpus Christi, where he was handcuffed to a chair and ridiculed by federal marshals.  Id. at 12.  Plaintiff asked Mark Sossi, a new attorney retained by his family to represent him, to file motions to move the trial to Louisiana for the convenience of his witnesses, and to have Defendant Judge Jack recused. Id. at 13.  Mr. Sossi responded that the latter might work to his disadvantage at sentencing if it were denied, and Plaintiff announced that he desired a new attorney.  Id.  On March 21, 2006, Mr. Sossi filed the motion to transfer, and on April 4, 2006 it was denied.  United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 192, 199). At the Nueces County Jail, Plaintiff was told that Defendant Judge Jack would ensure that he would die in prison.  (D.E. 1-1, at 15).

On or about March 27, 2006, Defendant Judge Jack fined and sanctioned Mr. Sossi for failing to investigate or interview witnesses.  Id. at 15-17.  After this court session, Mr. Sossi informed Plaintiff that he was being investigated for obstruction of justice as a result of his representation in the case.  Id. at 17.  When Plaintiff returned to Nueces County Jail, he was moved to "super max

lockdown" and told that the new status was at Defendant Judge Jack's request. Id. at 18.

On May 15, 2006, federal marshals taunted Plaintiff, threatening his family and reminding him that the truth was irrelevant in Corpus Christi. Id. at 18-20. During this period, Plaintiff was ostensibly allowed to meet with his attorney for three hours each week, but in actuality received only fifteen minutes. Id. at 21-22. He was also barred by Defendant Judge Jack from communication with his co-defendants, their families, or any witnesses, including his own. Id. at 22-23.

On or around July 8, 2006, Plaintiff was moved to Jim Wells County Jail, a facility with no law library for him to help prepare his defense, partly out of retaliation for his earlier legal research. Id. at 29. He continued to suffer a variety of deprivations, including severe and unwarranted restrictions on recreation time, access to mail services, phone privileges, food, and warmth. Id. at 31. He was also exposed to hazardous paint and cleaning supply fumes. Id. at 32. As a result of these restrictions, his leg muscles began to "wither away." Id. at 33. When confronted with Plaintiff's suffering, Mr. Sossi urged him to pleading guilty, telling him that this was the only thing that would ease his situation, particularly given the corruption and racism of the criminal justice system in Corpus Christi. Id. at 26, 34. Plaintiff announced that he would find a new attorney. Id. at 26.

On August 15, 2006, Defendant Judge Jack sanctioned Mr. Sossi for arriving late to court, demanding that he take his check book out and write a check on the spot. Id. at 28; United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 528, at 12-13). Upset at the sanctions, Mr. Sossi blamed Plaintiff for his poor treatment. (D.E. 1, at 26). On August 22, 2006, Plaintiff attempted to replace Mr. Sossi with Mr. Brooks, but was told by the latter that he was not well-versed in conspiracy law and that it would be more prudent to continue with Mr. Sossi given the late stage of litigation. Id. at 34-35. Mr. Sossi predicted that Plaintiff would be out of prison by Christmas if he pled guilty, and assured him that he would withdraw the plea if the pre-sentence report did not reflect

the punishment he believed appropriate.  Id. at 36.

On or about August 28, 2006, Plaintiff was left in his cell while every other inmate was removed to allow workers to paint the facility, a step that was taken at the request of federal marshals. Id. at 37.  He awoke in a "pool of [his] own blood, vomit, and urine."  Id.  Broken down by the treatment, Plaintiff finally agreed to plea guilty.  Id. at 37-38.

On October 23, 2006, Plaintiff pled guilty and waived his right to appeal the conviction and sentence. United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 340).  In his plea agreement, he agreed to forfeit all property involved in the offenses, including the seized $176,671.  Id. at 5.

On February 8, 2007, Mr. Sossi was removed from the case, and Mr. Gilmore re-appointed. (D.E. 1-2, at 1).  Plaintiff then discovered, through conversations with relatives and others, that Mr. Sossi never contacted any of his witnesses and failed to conduct the investigation that he requested. Id. at 2-3.  The witnesses now told Plaintiff that they would be willing to testify if offered protection, despite the threatening and intimidating behavior of Defendant Rodgers.  Id. at 3.  In light of these revelations, and as a result of being "mentally unstable at the time of [his] plea," on May 23, 2007 Plaintiff sent a letter seeking to withdraw the guilty plea.  Id. at 2.  United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 391).

On June 4, 2007, Defendant Judge Jack held a hearing regarding Plaintiff's motion to withdraw his guilty plea.  (D.E. 1-2, at 3).  He told Defendant Judge Jack that he was innocent, that his attorney had not adequately explained the law, and that the evidence demanded a lesser charge. Id. at 3-4.  Defendant Judge Jack asked Defendant Booth if the government wanted to try the case, and she replied that they did not, because the other defendants had finished their sentences and the prosecution would therefore be prejudiced.  Id. at 4.  The motion was denied.  Id.

On June 22, 2007, Plaintiff was sentenced to 360 months in prison, five years supervised

13

release, a forfeiture of $176,000, a fine of $10,000, and a special assessment of $100. <u>United States</u> <u>v. Moore</u>, CR-05-542 (S.D. Tex. 2005), at (D.E. 399, 402).

**C.     Post-Conviction Proceedings.**

Plaintiff filed a notice of appeal on July 2, 2007. <u>United States v. Moore</u>, CR-05-542 (S.D. Tex. 2005), at (D.E. 404, 406). On July 5, 2007, Defendant Judge Jack appointed Mr. Gilmore to represent him on appeal. (D.E. 1-2, at 2). He informed Plaintiff that Defendant Booth represented to him that she would move for a sentence reduction if he dropped the appeal, and Plaintiff declined. <u>Id.</u> at 6. The appeal omitted several grounds Plaintiff had instructed Mr. Gilmore to raise, and the attorney later explained that Defendant Judge Jack refused to make available the relevant portions of the record. <u>Id.</u> at 7-8. On April 28, 2008, the Fifth Circuit affirmed Plaintiff's conviction and dismissed his claims that the Court erred by rejecting his plea agreement, by refusing to allow him to withdraw his guilty plea, and by declining to grant him credit for acceptance of responsibility. <u>United States v. Moore</u>, 275 F. App'x 394 (5th Cir. 2008) (per curiam) (unpublished).

On June 23, 2008, Plaintiff filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255. <u>United States v. Moore</u>, CR-05-542 (S.D. Tex. 2005), at (D.E. 504). He raised fourteen grounds for relief, claiming, <u>inter</u> <u>alia</u>, that he was victimized by racist investigators who intimidated his witnesses, that his judges were biased, that prosecutorial misconduct and <u>Brady</u>[6] violations occurred, that he was denied effective assistance of counsel, that his confession and plea were coerced, that his conviction was obtained by virtue of an unconstitutional search and seizure, that his Fifth Amendment right to be free from compelled self-incrimination was violated, and that various jurisdictional defects rendered his conviction invalid. <u>Id.</u> On March 6, 2009, the motion was denied.

---

[6] <u>Brady v. Maryland</u>, 373 U.S. 93 (1963).

United States v. Moore, Nos. CR-05-542, C-08-202, 2009 WL 594473 (S.D. Tex. Mar. 6, 2009) (unpublished).  The court first dismissed Plaintiff's challenges to his plea, including his allegation of ineffective assistance at plea bargaining, because he had repeatedly confirmed that the plea was knowing and voluntary.  Id. at *12-13.  His remaining claims were dismissed as waived pursuant to the plea agreement.  Id. at *15.  On January 14, 2010, the Fifth Circuit declined to grant Plaintiff a certificate of appealability, holding that he waived his challenges to the district court's ruling by addressing only the merits and not the court's reasoning.  United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 587).

Plaintiff filed this action on April 6, 2011.  (D.E. 1).  On May 20, 2011, Plaintiff filed a motion to add seventeen defendants with no explanation as to their involvement in the alleged violations, (D.E. 13), and that motion was denied on May 31, 2011.  (D.E. 16).

### III.  PLAINTIFF'S ALLEGATIONS

Plaintiff asserts that he had the following constitutional rights violated: 1) his First Amendment right to free speech, assembly, association, and freedom of the press; 2) his Third Amendment right to be free from quartering soldiers in his home during peacetime; 3) his Fourth Amendment right to be free of unreasonable searches and seizures; 4) his Fifth Amendment right to a grand jury hearing in a criminal case, to be free of compulsory self-incrimination, to due process of law, and to be free from the taking of private property without just compensation; 5) his Sixth Amendment right to counsel, to a speedy, public, jury trial, to cross-examine adverse witnesses, and to present favorable witnesses; 6) his Seventh Amendment right to a civil jury trial; 7) his Eighth Amendment right to be free from excessive bail and fines and cruel and unusual punishment; and 8) his Thirteenth and Fourteenth Amendment right to equal protection of the law.  (D.E. 1-2, at 20-21). He further alleges that his rights pursuant to the Interstate Agreement on Detainers ("IAD") were

15

violated.  Id. at 23.  Plaintiff asks that congressional hearings be held at which he can question Defendants under oath, id. at 26-27, that the $176,671 seized from him be returned with interest, id. at 32, and that he receive compensation for his suffering, defamation, and mental anguish, id. at 33, as well as punitive damages.  Id.

## IV.  DISCUSSION

### A.    The Legal Standard For Screening Inmate Civil Rights Actions.

Pursuant to the Prison Litigation Reform Act, Pub. L. No. 104-134, 10 Stat. 1321 (1996), any prisoner action brought under federal law must be dismissed if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  See 42 U.S.C. § 1997e(c); 28 U.S.C. §§ 1915(e)(2), 1915A.  The same screening standards apply to Bivens actions filed by federal prisoners as to § 1983 actions filed by state inmates.  Ruiz v. United States, 160 F.3d 273, 274-75 (5th Cir. 1998) (per curiam).  Plaintiff's action is subject to screening regardless of whether he prepays the entire filing fee, or proceeds as a pauper.  Id.; Martin v. Scott, 156 F.3d 578, 580 (5th Cir. 1998) (per curiam) (citations omitted). His pro se complaint must be read indulgently, see Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (per curiam), and his allegations must be accepted as true, unless they are irrational or wholly incredible.  Denton v. Hernandez, 504 U.S. 25, 32-33 (1992).

An action may be dismissed for failure to state a claim "'when it is clear that the plaintiff can prove no set of facts in support of his claim'" entitling him to relief.  Oliver v. Scott, 276 F.3d 736, 740 (5th Cir. 2002) (citation omitted).  Furthermore, it may be dismissed for failure to state a claim upon which relief can be granted despite his failure to exhaust administrative remedies.  42 U.S.C. § 1997e(c)(2).

To state an actionable claim, plaintiffs filing pursuant to Bivens and § 1983  must allege that

16

the defendant or defendants were governmental actors who deprived them of rights, privileges, or immunities secured by the Constitution or laws of the United States.  Garcia v. United States, 666 F.2d 960, 962 (5th Cir. Unit B Feb. 1982) (citations omitted); Biliski v. Harborth, 55 F.3d 160, 162 (5th Cir. 1995) (per curiam).  In addition, Bivens limits recovery to intentional deprivations by federal officers.  Williamson v. U.S. Dep't of Agric., 815 F.2d 368, 381 (5th Cir. 1987).

**B.      Several Of Plaintiff's Claims Are Frivolous.**

There is nothing in Plaintiff's 115-page complaint to suggest that he was ever forced to quarter soldiers, nor to suggest that he was ever enslaved or placed in involuntary servitude, and his claims invoking the Third and Thirteenth Amendments are consequently frivolous on their face.  U.S. Const. Amends. III, XIII.  Plaintiff has likewise articulated no facts that could be remotely construed as bearing on his First Amendment rights to assembly, association, or freedom of the press, and these claims are equally frivolous.  Lastly, he mentions no conceivable Seventh Amendment violations. Accordingly, it is respectfully recommended that Plaintiff's claims pursuant to the Third, Seventh, and Thirteenth Amendments be dismissed with prejudice as frivolous, as well as his First Amendment claims for freedom of assembly, association, and the press.

**C.      Three Defendants Should Be Dismissed On Grounds Of Absolute Immunity.**

**1.      Defendant United States is entitled to sovereign immunity.**

Plaintiff names the United States of America as a defendant.  (D.E. 1, at 1).  Civil rights suits against the United States without its consent are barred by sovereign immunity, Affiliated Prof'l Home Health Care Agency v. Shalala, 164 F.3d 282, 286 (5th Cir. 1999) (per curiam) (citation omitted), and the United States has not waived its sovereign immunity for Plaintiff's claims.  See Brown v. United States, 653 F.2d 196, 199 (5th Cir. Unit A Aug. 1981).  Accordingly, it is respectfully recommended that all claims against the United States of America be dismissed with

prejudice as barred by sovereign immunity.

### 2.   Defendant Judge Jack is entitled to judicial immunity.

The Supreme Court has noted that "generally, a judge is immune from a suit for money damages." Mireles v. Waco, 502 U.S. 9, 9 (1991) (per curiam) (citations omitted). Immunity is overcome only for judicial actions taken without jurisdiction or actions taken in a non-judicial capacity. Id. at 11-12 (citations omitted). Judges are entitled to absolute immunity from damage claims "arising out of acts performed in the exercise of their judicial functions." Boyd v. Biggers, 31 F.3d 279, 284 (5th Cir. 1994) (per curiam) (citation omitted). "A judge's acts are judicial in nature if they are 'normally performed by a judge' and the parties affected 'dealt with the judge in his judicial capacity.'" Id. at 285 (quoting Mireles, 502 U.S. at 12).

Plaintiff's attack on Defendant Judge Jack's conduct focuses on the manner in which she conducted his criminal proceedings. Such conduct manifestly falls into the category protected from suit, and Plaintiff's claims against her therefore fail to overcome judicial immunity. Accordingly, it is respectfully recommended that all of Plaintiff's claims against Defendant Judge Jack be dismissed with prejudice as barred by judicial immunity.

### 3.   Defendant Assistant United States Attorney Booth is entitled to prosecutorial immunity.

Prosecutors are also entitled to absolute immunity in regards to actions taken within the scope of their professional duties. See Van de Kamp v. Goldstein, 555 U.S. 335, 129 S. Ct. 855, 861 (2009). Plaintiff's claims against Defendant Booth all involve her litigation of the drug conspiracy case against him. Consequently, these claims challenge the execution of her official duties and they do not surmount prosecutorial immunity. As a result, it is respectfully recommended that all of Plaintiff's claims against Defendant Booth be dismissed as barred by prosecutorial immunity.

Moreover, because Defendants United States, Judge Jack and Assistant United States Attorney Booth are entitled to absolute immunity, they are consequently immune from any claims for monetary relief.  Thus, dismissal of these Defendants is also proper pursuant to 28 U.S.C. §§ 1915(e)(2)(iii) and 1915A(b)(2), which require dismissal of claims for monetary relief "against a defendant who is immune from such relief."

**D.     Several Of Plaintiff's Claims Are Not Cognizable In A Prisoner Civil Rights Action.**

A civil rights action may not raise claims that challenge the constitutionality of a prisoner's conviction unless the conviction has been "reversed on direct appeal, expunged by executive order, declared invalid by a [court] ..., or called into question by a federal court's issuance of a writ of habeas corpus."  Heck v. Humphrey, 512 U.S. 477, 486-87 (1994).

Plaintiff's Sixth Amendment claim based on his right to a speedy trial plainly falls into this category, see Krause v. Leonard, 352 F. App'x 933, 935 (5th Cir. 2009) (per curiam) (unpublished) (discussing Heck), as does his invocation of the Fifth Amendment right to be free from compelled self-incrimination.  Clay v. Brown, No. 97-1845, 1998 WL 516794, at *2 (7th Cir. July 24, 1998) (per curiam) (unpublished) (discussing Heck).  Plaintiff's conviction remains valid, and these claims therefore must be dismissed.  His remaining Sixth Amendment claims (referencing his right to a speedy, public, jury trial, and his right to cross-examine and present witnesses) are essentially challenges to his guilty plea, which obviated the need for a trial.  These claims therefore not only challenge the constitutionality of his conviction, they have already been dismissed, United States v. Moore, Nos. C-05-542, C-08-202, 2009 WL 594473 (S.D. Tex. Mar. 6, 2009) (unpublished), and Plaintiff may not raise them here.

As for Plaintiff's Fourth Amendment claims, the appropriateness of Bivens as his legal vehicle hinges on "whether a judgment in favor of the plaintiff would necessarily imply the

invalidity of his conviction." <u>Heck</u>, 512 U.S. at 487.  It would.  The complaint's most central Fourth Amendment argument is that several of the various stops, searches, and arrests were committed without probable cause.  (D.E. 1, at 4).  Given the breadth of that claim, it is clear that prevailing on it would render unconstitutional the searches and seizures that led to his arrest, and with them the evidence that ultimately resulted in his indictment and conviction.  Plaintiff has presented no reason to suppose that a legal doctrine such as independent source, inevitable discovery, or harmless error would make a victory on these claims compatible with a valid conviction, and a review of the record does not suggest any.  <u>See</u> <u>Hudson v. Hughes</u>, 98 F.3d 868, 872 (5th Cir. 1996).  As a result, Plaintiff's Fourth Amendment claims relating to the searches and seizures are not cognizable in a <u>Bivens</u> action.

Another portion of the complaint that ultimately relies upon the Fourth Amendment is that which details Plaintiff's belief that Defendant Rodgers misled Louisiana authorities into arresting him on false grounds.  (D.E. 1, at 20-21).  A claim of false arrest, however, targets the constitutionality of the conviction and accordingly may not be brought in a prisoner civil rights action.  <u>See</u> <u>DeLeon v. City of Corpus Christi</u>, 488 F.3d 649, 654-56 (5th Cir. 2007).  Plaintiff also alleges that Defendant Rodgers threatened and intimidated witnesses into offering false testimony or refusing to testify on his behalf, and that he himself committed perjury on the stand as part of his effort to unjustly cause Plaintiff's conviction.  (D.E. 1, at 15-18).  These arguments essentially boil down to charges of malicious prosecution, and they are not suitable for a prisoner civil rights complaint.  <u>Jennings v. Patton</u>, 635 F.3d 655, 659 (5th Cir. 2011) (malicious prosecution claim in

prisoner civil rights action, standing alone, "must fail as a matter of law") (citation omitted).[7]

Accordingly, it is respectfully recommended that Plaintiff's Fourth and Sixth Amendment challenges, as well as his Fifth Amendment claim regarding compelled self-incrimination, be "'dismissed with prejudice to their being asserted again until the Heck conditions are met'" for failure to state a claim upon which relief can be granted.  DeLeon, 488 F.3d at 657 (citing Johnson v. McElveen, 101 F.3d 423, 424 (5th Cir. 1996)).  If Plaintiff desires to pursue relief on these claims, he must do so in a section 2255 motion.[8]

**E.     Plaintiff's Remaining Claims Should Be Dismissed For Lack Of Involvement By The Defendants.**

Personal involvement in an alleged constitutional deprivation is an essential element of a civil rights cause of action.  Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983) (citing Rizzo v. Goode, 423 U.S. 362, 371-72 (1976)).  Failing a showing of personal involvement, a plaintiff can only establish liability by demonstrating that an official had supervisory authority such that a "causal connection" links his purported acts to "the constitutional violation sought to be redressed."  Harvey v. Andrist, 754 F.2d 569, 572 (5th Cir. 1985) (citations omitted).

**1.     The claims relating to Plaintiff's treatment while incarcerated have not been filed against the proper defendants.**

Plaintiff claims that he was subjected to various abuses by correctional officials while in confinement pending disposition of the criminal charges against him.  These allegations include that

---

[7] Plaintiff's claim that his money was seized without just compensation as required by the Fifth Amendment also fails to state a claim, as "that amendment's prohibition against the confiscation of property by the government without just compensation is not implicated by the legal seizure of property pursuant to a criminal investigation," Dickens v. Lewis, 750 F.2d 1251, 1255 (5th Cir. 1984), which is exactly what occurred in his case.

[8] Plaintiff has already lodged most of the arguments he raises here pursuant to § 2255, United States v. Moore, CR-05-542 (S.D. Tex. 2005), at (D.E. 504), and seen them dismissed, United States v. Moore, Nos. C-05-542, C-08-202, 2009 WL 594473 (S.D. Tex. Mar. 6, 2009) (unpublished).

he was kept in inhumane conditions at various correctional facilities, unfairly denied various privileges, and prevented from accessing legal materials and the court system.  Such claims may state a civil rights claim, but not against the named defendants here.

In Plaintiff's complaint, he identifies Defendant Doe only as a "Hispanic law enforcement agent."  (D.E. 1, at 1).  The only male, Hispanic law enforcement officer explicitly addressed in the complaint is the individual who allegedly pulled Plaintiff and his companions over fifteen miles from the Sarita checkpoint on October 5, 2004.  Id. at 3.  The claims against that officer are exclusively concerned with his purportedly unjustified stop, seizure, and arrest of Plaintiff and his companions.  Such arguments are challenges to the conviction and therefore cannot be brought pursuant to Bivens or § 1983.  Plaintiff has shown neither personal involvement nor any causal connection between Defendants Rodgers and Doe and the conditions of his confinement or his treatment while incarcerated.  Accordingly, it is respectfully recommended that these claims be dismissed.[9]

## 2.    Plaintiff's IAD claims have not been filed against the proper defendants.

Plaintiff alleges that rights he possessed by virtue of the IAD were violated.  The IAD is a compact between forty-nine sovereignties.  See Alabama v. Bozeman, 533 U.S. 146, 149 (2001).  Its purpose is to "'prescribe[] procedures by which a member ... may obtain for trial a prisoner incarcerated in another member jurisdiction.'"  Walker v. Warden, U.S. Penitentiary, Atlanta, Ga., 588 F.2d 1090, 1094 (5th Cir.), vacated as moot 593 F.2d 21 (5th Cir. 1979) (per curiam).  As a "congressionally mandated compact," Lara v. Johnson, 141 F.3d 239, 242 (5th Cir. 1998), the IAD

---

[9] Plaintiff's allegation that his property was seized without just compensation not only fails to state a claim, it is also filed against the wrong defendants, as neither Defendant Doe nor Defendant Rodgers were, by Plaintiff's own telling, involved in that seizure.  (D.E. 1, at 6-10).

does confer certain federal statutory rights on prisoners who are transferred pursuant to its terms, and can therefore sustain some civil rights actions.  See Cuyler v. Adams, 449 U.S. 433, 449-50 (1981).

However, the IAD only applies to convicted prisoners, not pretrial detainees, and the only claims Plaintiff could have pursuant to the compact would have arisen before his conviction.  See United States v. Irving, Nos. 3-06-CR-111, 3:09-CV-648, 2009 WL 2138409, at *1 (N.D. Tex. July 17, 2009) (unpublished) (collecting cases from Sixth, Ninth, and Tenth Circuits).  Additionally, Plaintiff waived any claims pursuant to the IAD by pleading guilty.  See McNeil v. Keffer, No. 09-166, 2009 WL 1664469, at *6 (W.D. La. June 12, 2009) (unpublished) (citing Baxter v. United States, 966 F.2d 387 (8th Cir. 1992)).

Moreover, Plaintiff cannot avail himself of the compact because he fails to allege any facts linking either Defendant Doe or Defendant Rodgers to any of the decisions to transfer him from one sovereign to another.  Judging from their positions, and the nature of interstate transfers, the insinuation that these individuals were in a position to exercise ultimate authority for Plaintiff's movement from state to state is irrational and wholly incredible.  See Tungate v. Thoms, 45 F. App'x 502, 504-05 (6th Cir. 2002) (per curiam) (unpublished) (assuming that Bivens action based on IAD is properly filed against the Director of the Bureau of Prisons); Cuyler, 449 U.S. 433 (interpreting rights afforded by IAD in context of civil rights action filed against superintendent of state prison).  Indeed, to the extent that the rights created by the IAD, which mainly relate to the timing of trials and transfers, see Bozeman, 533 U.S. at 151, concern officials other than correctional authorities, they would seem to apply only to prosecutors and judges, both of whom are protected by absolute immunity.  There does not appear to be a single case in which a court has upheld the

right of a prisoner to file a <u>Bivens</u> action against an individual law enforcement officer for his entirely speculative role in an inmate-transfer.  Accordingly, it is respectfully recommended that Plaintiff's IAD claims be dismissed for failure to state a claim against the named defendants on which relief can be granted.[10]

### 3.    The claims should be dismissed with prejudice.

An incarcerated plaintiff who is proceeding <u>pro</u> <u>se</u> "should be accorded leniency and should be permitted to amend his pleadings when it is clear from his complaint that there is a potential ground for relief."  <u>Gallegos v. State of La. Code of Criminal Procedures Article 658 Paragraph A and C(4)</u>, 858 F.2d 1091, 1092 (5th Cir. 1988) (per curiam) (citation omitted).  Such amendments are often allowed when, as here, a plaintiff fails to name the proper defendants.  <u>See</u>, <u>e.g.</u>, <u>Antonelli v. Lappin</u>, 134 F. App'x 700, 701 (5th Cir. 2005) (per curiam) (unpublished).  The Fifth Circuit construes the rule broadly to permit amendments unless the record suggests that the claim is frivolous.  <u>See</u> <u>Ballard v. Texas</u>, No. 02-50201, 2002 WL 31049454, at *1 (5th Cir. Aug. 30, 2002) (per curiam) (unpublished).

In light of this lenient standard and the incomplete record before the Court, it is impossible to say that Plaintiff clearly has no potential ground for relief on the claims relating to his confinement and transfers.  Nevertheless, when considering whether to allow a <u>pro</u> <u>se</u> plaintiff to amend his complaint to add the proper defendants, a court may also consider the futility of the

---

[10] It should also be noted that Louisiana was involved in each of Plaintiff's custodial transfers according to his complaint, (D.E. 1, at 20-22), and that Louisiana is one of only two states that is not a party to the IAD.  <u>See</u> <u>Pitsonbarger v. Gramley</u>, 103 F.3d 1293, 1300 (7th Cir. 1996), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> 522 U.S. 802 (1997). Thus, even though Texas and the federal government <u>are</u> signatories to the compact, it is doubtful that Plaintiff's transfer was arranged pursuant to its terms and therefore unlikely that he could enforce the provisions of the IAD against <u>anyone</u>.  <u>See</u> <u>generally</u> Tex. Code Crim. Pro. art. 51.14 (suggesting that compact applies only when "a person has entered upon a term of imprisonment in ... a <u>party state</u>, and whenever during the continuance of the term of imprisonment there is pending in any other <u>party state</u> any untried indictment, information, or complaint....") (emphasis added).

potential amendment.  See, e.g., McCullough v. Tex. Dep't of Criminal Justice, No. 95-20475, 1995
WL 696758, at *1 (5th Cir. Oct. 18, 1995) (per curiam) (unpublished) (citing Davis v. La. State
Univ., 876 F.2d 412, 413-14 (5th Cir. 1989)).

Plaintiff dates the most recent unconstitutional incident relating to his confinement as August
28, 2006.  (D.E. 1-1, at 37).  He claims that his most recent transfer took place in August 2005.
(D.E. 1, at 22).  The statute of limitations for these claims would be two years, Hatchet v. Nettles,
201 F.3d 651, 652-53 (5th Cir. 2000) (per curiam) (citations omitted); Spotts v. United States, 613
F.3d 559, 573 (5th Cir. 2010) (citations omitted), and the claims are therefore time-barred.  The only
way Plaintiff could avoid dismissal would be to relate these defendants back to an earlier civil rights
action that was timely filed pursuant to Rule 15(c) of the Federal Rules of Civil Procedure, and there
is no such action.  See Sanders-Burns v. City of Plano, 594 F.3d 366, 377-80 (5th Cir. 2010).  As
a result, any amendment would be futile, and it is respectfully recommended that the claims relating
to Plaintiff's incarceration and transfers be dismissed with prejudice.

## V.  RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that Plaintiff's claims
pursuant to the Third, Seventh, and Thirteenth Amendments be dismissed with prejudice as
frivolous, as well as his First Amendment free press, association and assembly claims.  It is further
respectfully recommended that the claims against Defendants United States of America, Judge Janis
Graham Jack, and Assistant United States Attorney Patricia Hubert Booth be dismissed with
prejudice as barred by sovereign, judicial, and prosecutorial immunity respectively.  In addition, it
is respectfully recommended that Plaintiff's Fourth, Fifth, and Sixth Amendment claims be
dismissed with prejudice to their being asserted again until the Heck conditions are met.  Finally,

it is respectfully recommended that Plaintiff's claims regarding his treatment while incarcerated and his IAD claims be dismissed with prejudice for lack of personal involvement by the named defendants and as time-barred.

Respectfully submitted this 14th day of June 2011.

BRIAN L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(C); Rule 72(b) of the Federal Rules of Civil Procedure; Rule 8(b) of the Rules Governing § 2254 Cases; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).